# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| MELISSA MULLINS, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 1:12cv028 |
| v. | ) |
| | ) |
| SOUTHWEST VIRGINIA | ) |
| REGIONAL JAIL AUTHORITY, | ) By: Hon. Michael F. Urbanski |
| | ) United States District Judge |
| Defendant. | ) |

## MEMORANDUM OPINION

This action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., is scheduled to be tried by a jury on November 12-13, 2013. Currently before the court is defendant Southwest Virginia Regional Jail Authority's motion for summary judgment (Dkt. # 15). The parties appeared before the court via conference call on October 10, 2013 for a hearing held on the record, at which time the court granted defendant's motion as to plaintiff's gender discrimination claim and took under advisement the motion as to plaintiff's retaliation claim. For the reasons set forth below, the motion for summary judgment as to the retaliation claim is **DENIED**.

### I.

Plaintiff Melissa Mullins was employed by the Southwest Virginia Regional Jail Authority ("the Authority") for over six years. At the time of her termination on March 22, 2011, she had attained the rank of lieutenant. Mullins alleges that she was terminated in retaliation for her complaints of gender discrimination—specifically, that the Authority denied

her the opportunity to attend an annual training conference in Virginia Beach while sending male officers to the conference.[1]

The facts giving rise to the retaliation claim are captured largely on two audio recordings of meetings held on March 2, 2011 between Mullins, Lieutenant Jeannie Patrick and Captain Dwayne Lockhart, and on March 3, 2011 between Mullins, Superintendent Stephen Clear and Human Resources Director Georgia Fitzgerald.[2] The March 2nd meeting was held following an email sent by Mullins to her supervisor Captain Lockhart, and to HR Director Fitzgerald, in which Mullins asserted that she had never been asked to attend any Virginia Beach training conferences in her six years of employment. Mullins complained:

> I am finding it extremely hard to understand why a "male" sergeant has been asked to go more than once and has been asked before his "female" Lieutenant. I am also finding it hard to understand why a "male" Lieutenant that has only been in that position for 2 months over a "female" Lieutenant with over 5 years in that same position.
>
> . . . I am deeply concerned that this might carry on to other female officers.

Def.'s Summ. J. Br., Dkt. # 16, at Ex. 2. Mullins, Captain Lockhart, and Lieutenant Jeannie Patrick[3] met in Lockhart's office to discuss the concerns raised by Mullins. Id. at Ex. 3. Captain Lockhart began the meeting by stating: "OK. Uh. I was wanting to talk to you about this email that you sent to me. It is very offensive to me. And I wanted to know if you meant to offend me by this email." Id. at Ex. 3, p. 2. Mullins explained she did not mean to offend but meant what

---

[1] Finding no evidentiary support in the record for Mullins' gender discrimination claim, the court granted summary judgment in favor of defendant on the record at oral argument. See Dkt. # 33.
[2] These audio recordings, along with transcripts of the audio recordings, were provided as exhibits to defendant's summary judgment brief. See Def.'s Summ. J. Br., Dkt. # 16, at Ex. 3, Ex. 8.
[3] It is readily apparent from the record evidence that the presence of Lieutenant Patrick at this meeting upset Mullins. For example, in a summary of the meeting that Mullins sent via email to HR Director Fitzgerald later that day, Mullins stated as regards Lieutenant Patrick, "I didn't feel she had the right to be in the meeting nor to question me . . . . I should not have to explain myself to another Lieutenant just because the Capt. wants her in the room." Def.'s Summ. J. Br., Dkt. # 16, at Ex. 7. See also discussion, infra.

she said.  Mullins claimed to have asked Lockhart if she could attend the conference the previous year; Captain Lockhart indicated he did not recall her making such a request.  Lockhart claimed Mullins had been asked to attend the conference in past years but could not go because of illness; Mullins did not recall being asked.  Additionally, Lockhart stated, "[W]e wanted to send you last year.  Because that's when we sent Debbie, Linda, and Shannon to Virginia Beach.  And we knew you were having some illness problems so we didn't even ask last year."  Id. at Ex. 3, p. 4.  Lockhart insisted that "[t]his has nothing to do with male/female," and that "for you to come at me with an email like this saying the only reason I didn't send you was because you was a female.  That offends me."  Id. at Ex. 3, p. 5.  Lockhart stated that the purpose of the meeting was "to clear the air" on Mullins' email "because it really offended [him] and [he] wanted to see if that's what [Mullins] was trying to do.  Was to offend [him] and all that."  Id. at Ex. 3, p. 7.

Later that evening, Captain Lockhart emailed Superintendent Clear, copying Mullins, stating: "Lt. Mullins has expressed interest in attending the conference in Virginia Beach this year.  Is there still time for her to register to go?"  Superintendent Clear responded, "Yes, there is plenty of time, I can do it in the morning.  I believe their [sic] is an officer from Duffield she can room with."  Id. at Ex. 4.  The following morning, on March 3, 2011, Mullins responded to Captain Lockhart via email, copying Superintendent Clear, Major Matthew Pilkenton, and HR Director Fitzgerald, and stating:

> After talking with you and Lt. Patrick in the office yesterday, I felt intimidated and belittled.  Another Lieutenant should not have been in our meeting together and had no right to ask me any questions at all.  I advised you that I would take this higher and I feel like you contacted Superintendent Steve Clear to try and cover your oversight.  So at this time, I formally decline to go.

Id. at Ex. 6.

3

A lengthy meeting between Mullins, Superintendent Clear and HR Director Fitzgerald on March 3rd followed this email. At the beginning of this meeting, Superintended Clear asked for a copy of Mullins' initial email to Captain Lockhart concerning the Virginia Beach conference because he had not seen it and "didn't know what was going on." Id. at Ex. 8, p. 1. The discussion began:

> Mullins: Yeah. You look like you're mad right now.
>
> Clear: I am. I really and truly am.
>
> Mullins: Well, I.
>
> Clear: No. If I was you I wouldn't say nothing right now. Just sit there a minute a[nd] let me read this. I haven't even read this yet.

Id. at Ex. 8, p. 1-2. When asked what this email had to do with, Mullins once again complained that in the six years of her employment she had never been asked to attend the Virginia Beach conference when "a lieutenant that's only been here for two months" and her sergeant who had already attended the conference before had been asked to go. Superintendent Clear explained that all three conference attendees last year were females because "[w]e double up [in rooms] now," id. at Ex. 8, p. 4, and that the attendees this year would be male for that same reason.

While gender issues concerning the Virginia Beach conference was the subject of Mullins' original complaint to Captain Lockhart and presumably prompted the meeting with Superintendent Clear, much of the discussion during the March 3rd meeting focused on how Mullins felt "belittled" in the March 2nd meeting with Captain Lockhart and Lieutenant Patrick. Specifically, Mullins noted that Lockhart "set the tone" by asking at the outset, "Did you try to offend me?," and the situation escalated when "Jeannie [Patrick] intervene[d] trying to ask questions. . . . She had no business being there." Id. at Ex. 8, p. 11-12; see also id. at Ex. 8, p.

4

37. Superintendent Clear explained that as an administrative lieutenant, Patrick had a right to be in that meeting and, in fact, given the tone of Mullins' initial email to Captain Lockhart, Clear would have "probably fired" Lockhart if he had not had someone else in the meeting with him. Id. at Ex. 8, p. 12. HR Director Fitzgerald stated that Mullins had "expressed to [her] before that she has a problem with Jeannie Patrick because Jeannie is patronizing to her." Id. at Ex. 8, p. 13. Mullins clarified her feelings about Lieutenant Patrick, explaining she felt Patrick had the support of Captain Lockhart and Major Pilkenton no matter what, but Mullins did not, and that sometimes things "happen on the shift that really [Lieutenant Patrick] has no business answering." Id. at Ex. 8, p. 14. The conversation proceeded as follows:

> Mullins: [Lieutenant Patrick] make[s] a decision to get my shift hurt or in trouble.
>
> Clear: So. So you think that she's making
>
> Mullins: I think she has no business telling me what to do on my shift. There you go.
>
> Clear: Ok.
>
> Mullins: She doesn't have the experience or the knowledge of what's going on back there to do that. Period.
>
> Clear: Ok. There's nothing wrong with that feeling at all.
>
> Mullins: Well no because it's true.
>
> Clear: Ok. Uh. Now If- have you specifically mentioned that to anyone other than Georgia [Fitzgerald]? Cause now when you go in to talk to Dwayne [Lockhart] she's probably there so you're not going to talk to Dwayne about it there. Right?
>
> Mullins: Well I don't know if I've said anything—I don't know. I really have to think about that. I don't know if I said anything to him or not.
>
> Clear: Ok.

5

| Mullins: | Cause usually it's something that's quick decision and then it is over. |
|---|---|
| Clear: | Ok. |
| Mullins: | And I can make arrangements to go around that. You see what I'm saying? |
| Clear: | Ok. So if she tells you to do something you're telling me you make arrangements to go around it. |
| | . . . |
| Mullins: | . . . I may have to do something on—so that my shift is safe. You see what I'm saying. |

Id. at Ex. 8, p. 16-17. The conversation continued:

| Clear: | Ok. I can—you correct me if I'm saying this wrong. I sense that you do not have confidence in Jeannie [Patrick] or Dwayne [Lockhart]. |
|---|---|
| Mullins: | Well you probably sense I don't have confidence in none of you. |
| Clear: | in none of us? |
| Mullins: | Yes |

Id. at Ex. 8, p. 19. Mullins made plain that she intended this statement to mean she lacked confidence in Superintendent Clear as well:

| Clear: | . . . So you don't have confidence in any of the management. |
|---|---|
| Mullins: | Not much, no. |
| Clear: | And you're that unhappy in your job? |
| Mullins: | I love my job. I love my job. |
| Clear: | Ok. |
| Mullins: | But my job is to take care of shifts. |

6

| | |
|---|---|
| Clear: | Ok. Here's the thing, here's the thing you have no confidence in any of the management here. |
| Mullins: | right. |
| Clear: | all the way up. |
| Mullins: | No. just from— |
| Clear: | wait a minute. |
| Mullins: | Just the top 3. |
| Clear: | So me, Matt [Pilkenton], and Dwayne [Lockhart]. |
| Mullins: | Yeah. |
| Clear: | Well I mean that's all of it. |
| Mullins: | Ok then ok. |

Id. at Ex. 8, p. 21; see also id. at Ex. 8, p. 20. Superintendent Clear then directed HR Director Fitzgerald to escort Mullins back to get her belongings "before [they] get too deep into this." Id. at Ex. 8, p. 22. Clear stated he was placing Mullins on leave with pay[4] because:

> . . . I need some time to interview and look at the management structure. Cause you have brought up some points that I definitely need to look at. But I also got to come up with some ideas. The fact that you said you do not have confidence I'm not going to wrap my mind around it about now because I've got so many other [sic] going on so I'm going to think about that. Ok. And like I said nobody else will know. Here's the thing though Melissa next week you are going to be off all week because I'm out of the country and I'm trying to get my father-in-law in the nursing home, trying to get him settled and them I'm leave [sic]. I'm going [sic] be gone all next week out of the country so you're going to have a whole week and I hope you think about it. You know and ultimately what I hope is when I get back I will look at it again. I'm going to sit down with Georgia [Fitzgerald] and let her look at it. And I am going to say Georgia, tell me reading, after reading this, what do you think? And I'm going to ask her. I'm

---

[4] Clear directed HR Director Fitzgerald to put the leave in the system as vacation time so no one else would know about it. Def.'s Summ. J. Br., Dkt. # 16, at Ex. 8, p. 22.

7

going to say Georgia, what do you think can be done? And then we are going to call you back in and then I'm going to say Melissa again I'm going to say what do you expect to happen from here. From this time forward. . . .

Id. at Ex. 8, p. 22-23. Mullins asked why she was being put on leave and Clear responded:

"Because I'm leaving and you just told me you don't have confidence in the management here. I can't leave—no, no, no, no, no. . . . I can't leave with the comments that you've made." Id. at Ex. 8, p. 23-24. He continued:

> Again what this has to do with is again you got over a matter of one email, a meeting, and a second email there's an escalation that I'm not comfortable with.
>
> . . . And then I'm not comfortable with your statement saying you have no confidence in me and other management. Ok.

Id. at Ex. 8, p. 27.

On March 22, 2011, Superintendent Clear sent Mullins a letter that stated:

> I have taken some time to review our meeting on March 4 [sic]. Though several issues were discussed, your thoughts and conclusions on the leadership of the Authority keep recurring in my review. As Lieutenant of the Abingdon Facility, you are a major part of the leadership of the Authority and there is a certain level of expectations. Your statement that you had no confidence in any of the leadership of the Authority and the general tone of the entire conversation concerning your supervisors leads me to the conclusion that your services are no longer required by the Authority.

Id. at Ex. 15. With respect to what prompted this letter, Clear stated in his affidavit:

> Due to my planned vacation, Lieutenant Mullins was placed on leave with pay until I could return and interview other involved personnel. Because of the vacation and a death in my family, the leave was extended. Upon returning, I reviewed the emails, emails concerning her meeting with the Captain, discussed the issues with the Captain and Operations Lieutenant Jeannie Patrick and spent time with the employees on Lieutenant Mullins['] shift. Upon my return I spoke with Ms. Georgia Fitzgerald concerning our meeting with Lieutenant Mullins to gather her opinion as to the letter that I

8

> had decided to send to Lieutenant Mullins. For I had decided on March 22, 2011 that Lieutenant Mullins['] services were no longer required by the Authority. . . . I spoke with Major Pilkenton, Georgia Fitzgerald, and Captain Lockhart concerning the recent events and listened to the recorded conversation between Lieutenant Mullins, Captain Lockhart, and Operations Lieutenant Patrick.

Id. at Ex. 9, ¶ 6. Clear stated further:

> [I]t is Lieutenant Mullins['] own statements about no confidence in the administration, working around orders that had been given to her . . . with no concern why those orders were given, and her own perceptions of her shifts morale . . . . All these sticking in my mind. I agree with Lieutenant Mullins that her job is a dangerous one. But as an officer in the jail, she must rely on policy, her co-workers, her supervisors, and the jail administrator to maintain safety not only for themselves but for each inmate and if a Lieutenant, in this case Lieutenant Mullins, makes a decision to go around an order without knowing the exact reasons for the order, this can create an unsafe environment in the Abingdon Jail. So not only did Melissa Mullins verbalize more than once that she had no confidence in the management in particular of those officers above her (which would include Major Pilkenton, Captain Lockhart, and Operations Lieutenant Patrick) she was acting out that lack of confidence by going around the instructions of my Operations Lieutenant Patrick. While acknowledging on one hand that Lieutenant Patrick was the person in charge when Captain Lockhart and Major Pilkenton were not around she emphasized in our conference that Lieutenant Patrick "has no business telling me what to do on my shift."

Id. at Ex. 9, ¶ 11. Superintendent Clear explained that this concern was compounded by a note he saw in Mullins' personnel file from Captain Lockhart dated December 9, 2010, which stated: "This is the third time that Lt. Mullins has moved people around without asking or getting direction from me. I have placed all three people on the shift and she moves them without checking with me." Id. at Ex. 9, ¶ 15; see id. at Ex. 18.

The Authority argues that this evidence establishes there is no genuine issue of material fact as to the reason for terminating Mullins' employment:

9

> Mullins lost her employment with the Authority . . . because she made it clear to the Superintendent of the Authority that she had absolutely no confidence in him or her supervising major, her supervising captain, or the administrative lieutenant and was as a result willing to take actions at the jail contrary to jail policy and the directives that she had been given. Such insubordination and violation of policy are legitimate and sufficient reasons for Lieutenant Mullins to lose her job with the jail Authority.

Def.'s Summ. J. Br., Dkt. # 16, at 19. Mullins, on the other hand, argues that after she complained of gender discrimination she was subjected to retaliation—first, by Captain Lockhart who "repeatedly ignored the discrimination itself and focused the meeting solely on questioning plaintiff as to whether she intended to offend the Captain by making this complaint," and then by Superintendent Clear who "began the meeting by stating that he was 'really and truly' mad because plaintiff had complained of sex discrimination." Pl.'s Br. in Opp. to Summ. J., Dkt. # 22, at 12. Mullins contends that "[r]ather than management taking appropriate action and addressing plaintiff's complaint in a professional manner, management chose to get angry, accuse, speaking in a booming and loud manner, and intimidate plaintiff in every way possible, obviously to convince her to withdraw her complaint." Id. Mullins claims that "such actions by management in response to a complaint of discrimination, obviously made in good faith, could not possibly inspire confidence in any reasonable person." Id. at 13. Mullins asserts that there is strong circumstantial evidence of retaliation in violation of Title VII.

## II.

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). When making this determination, the court should consider "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Nguyen, 44 F.3d at 237. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "All reasonable inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion," but "[a] mere scintilla of evidence supporting a case is insufficient." Nguyen, 44 F.3d at 237.

### III.

To prevail on her retaliation claim, Mullins "must satisfy the three-step proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)." Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998). First, she "must establish, by a preponderance of the evidence, a prima facie case of retaliation." Laughlin, 149 F.3d at 258. "Once established, the burden shifts to the [Authority] to rebut the presumption of retaliation by articulating a non-[retaliatory] reason for its action." Id. (citing Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985)). If the Authority meets this burden of production, the presumption "created by the prima facie case is rebutted and 'drops from the case,' and [Mullins] bears the ultimate burden of proving that she has been the victim of

11

retaliation." Id. (internal citations omitted). At this third step, plaintiff must show that the stated reason for her termination was pretext. McDonnell Douglas, 411 U.S. at 804.

Turning to the first step of the McDonnell Douglas framework, Mullins has the burden of proving a prima facie case of retaliation under Title VII by establishing: "(1) that she engaged in protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action." Laughlin, 149 F.3d at 258 (citing Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996)). "Protected activity under Title VII is divided into two categories, opposition and participation." Id. at 257. The statute provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In short, "[a]n employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." Laughlin, 149 F.3d at 259. Participation includes "(1) making a charge [with the EEOC]; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." Id. (citing 42 U.S.C. § 2000e-3(a)). "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Id. (citing Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981)).

Plainly, Mullins engaged in protected opposition activity by raising complaints of gender discrimination, specifically related to the Virginia Beach conference. Moreover, it is undisputed

that Mullins was placed on paid administrative leave and then terminated. The temporal proximity between Mullins' discrimination complaints and her termination sufficiently establishes a causal connection between the protected activity and the adverse employment action. Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) ("Hoyle demonstrates a causal connection because of the temporal proximity between her complaints and her reassignment."); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) ("While this proof [that plaintiff was discharged after her employer became aware that she had filed a discrimination charge] far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality."). Thus, Mullins has made a prima facie showing of retaliation.

The Authority, however, has rebutted the presumption of retaliation by articulating a non-retaliatory reason for Mullins' discharge—that she was terminated as a result of her own statements concerning her lack of confidence in management and her insubordination. Therefore, under the applicable framework:

> The presumption created by establishing a prima facie case "drops from the case," Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 n.10 [(1981)], and "the factual inquiry proceeds to a new level of specificity," id. at 255 []. This new level of specificity "refer[s] to the fact that the inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of [retaliatory conduct] the parties have introduced." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,--, 113 S. Ct. 2742, 2752 [] (1993).

Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995). Mullins bears "'the ultimate burden of persuading the court that [she] has been the victim of'" retaliation in violation of Title VII. Id. (quoting Burdine, 450 U.S. at 256). Thus, it is not enough that Mullins prove the Authority's articulated reason for her termination is false; she must prove "'*both* that the

13

reason was false, *and* that [her complaints of discrimination were] the real reason' for the challenged conduct." Id. at 377-78 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)); accord Adams v. Trustees, 640 F.3d 550, 560 (4th Cir. 2011). In so doing, she cannot rely merely on her own assertions. See Adams, 640 F.3d at 560 (quoting Williams, 871 F.2d at 456). Rather, Mullins must show "specific proofs and rebuttals" of retaliatory conduct. St. Mary's, 509 U.S. at 516. Evidence relevant to the issue of pretext may include defendant's treatment of plaintiff during her employment and defendant's reaction, if any, to plaintiff's legitimate civil rights activities. McDonnell Douglas, 411 U.S. at 804-05.

However, "a plaintiff is not required to offer *additional* evidence to show pretext other than that which [s]he offered to make out h[er] prima facie case. . . ." Thurston v. Am. Press, 497 F. Supp. 2d 778, 781 (W.D. Va. 2007). At the pretext stage, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom. . . on the issue of whether the defendant's explanation is pretextual,' Burdine, [450 U.S.] at 255, n.10 []." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated against plaintiff]." Id. at 148.

The Authority argues that the evidence in this case "is so one sided that it does not present a sufficient disagreement to require submission of the issues in this case to a jury. . . ." Def.'s Reply Br., Dkt. # 30, at 13. Specifically, the Authority contends that Mullins has failed to cite record evidence that would give a jury reasonable grounds for determining the reasons given by Superintendent Clear for her termination were false and that the real reason she was

14

discharged was her complaint of gender discrimination. See Dkt. # 36. The court finds, after careful review, that the record does not warrant summary judgment on the retaliation claim.

Throughout the March 2nd meeting, Captain Lockhart repeatedly stated that he was offended by Mullins' email complaint of gender discrimination. Likewise, Superintendent Clear made plain at the outset of the March 3rd meeting that he was mad and that "[i]f [he] was [Mullins] [he] wouldn't say nothing right now." Def.'s Summ. J. Br., Dkt. # 16, at Ex. 8, p. 2. He later stated, "Well, I will grant you I'm upset. I'm upset because I wasn't coming in today. I had—dealing with a father-in-law and now then I have to come in and deal with this," referring to Mullins' emails. Id. at Ex. 8, p. 17.

When the conversation at the March 3rd meeting turned from Mullins' complaints of discrimination to her feelings about Lieutenant Patrick, Mullins expressed her belief that Lieutenant Patrick "doesn't have the experience or the knowledge of what's going on back there" and had "no business" telling Mullins what to do on her shift. Id. at Ex. 8, p. 16. Superintendent Clear responded by stating: "There's nothing wrong with that feeling at all." Id. Yet Clear stated in his affidavit that one of the reasons for Mullins' termination was that Mullins "emphasized in [the March 3rd] conference that Lieutenant Patrick 'has no business telling [Mullins] what to do on [her] shift.'" Id. at Ex. 9, ¶ 11.

These statements by Captain Lockhart and Superintendent Clear and the overall tone of the March 2011 meetings, coupled with the close temporal proximity between Mullins' complaints of discrimination and her termination, lead the court to believe that the issue of pretext and the ultimate issue of retaliation must be decided by a trier of fact. The court cannot determine as a matter of law that Mullins' termination resulted from the statements she made at the March 3rd meeting concerning her lack of confidence in management and admitted

15

willingness to disobey orders given by Lieutenant Patrick, rather than from her complaints of gender discrimination, which she raised at the very same meeting.

This is especially true in light of the fact that the record contains almost no evidence that Mullins was failing to meet the Authority's performance expectations prior to March 2011. This is not a case in which Mullins' assertions of unlawful retaliation must be viewed against a long history of documented poor performance and insubordination. Cf. Williams, 871 F.2d at 459 (plaintiff's own assertions of discrimination, "[s]et against the documented deterioration of her work after she was placed on probation and her continued abuse of telephone privileges after repeated warnings," could lead no reasonable trier of fact to conclude that retaliation figured into her dismissal). Indeed, Mullins provides as an exhibit to her response brief commendations she received from Major Pilkenton on her work performance in December 2010, just a few months prior to her termination. Pl.'s Resp. Br., Dkt. # 22, at Ex. 2. The document states:

> It is one thing to do a job and yet another to do a job well and with pride; you have exhibited the latter trait very well. For you, this is not merely a job but a career. Through your efforts, it is shown that you perform the tasks of your work to the highest level of your ability. That effort is hereby appreciated and you are commended for it.

Id.

The sole evidence in the record of any history of poor performance in Mullins' six-year employment with the Authority is a December 9, 2010 note in Mullins' personnel file stating Mullins had "moved people around without asking or getting direction from" Captain Lockhart. Def.'s Summ. J. Br., Dkt. # 16, at Ex. 18. This note does not mention Lieutenant Patrick and was only discovered by Superintendent Clear after he had placed Mullins on administrative leave following the March 3rd meeting. Id. at Ex. 9, ¶ 15. Plainly, this note had been in Mullins' personnel file for several months and had not given the Authority reason to terminate her up until

March 2011—the point at which she happened to raise her complaint of gender discrimination. From this evidence, a rational trier of fact could conclude that Mullins' alleged insubordination is pretext for retaliation.

It may well be that, at the end of the day, Mullins cannot meet her burden of persuasion on her retaliation claim by proving she was terminated because she raised complaints of gender discrimination. Indeed, the United States Supreme Court recently articulated in the case of University of Texas Southwestern Medical Center v. Nassar, --- U.S. ---, 133 S. Ct. 2517, 2533 (2013), that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," not the lessened "motivating-factor" causation test set forth in 42 U.S.C. § 2000e-2(m), which is applicable to cases involving intentional discrimination based on race, color, religion, sex or national origin. "This requires proof that the unlawful retaliation would not have occurred in the absence of alleged wrongful action or actions of the employer." Nasser, 133 S. Ct. at 2533.

At this stage, however, the court cannot say based on the evidence before it that no reasonable juror could find in favor of the plaintiff. There is a sufficient nexus between the protected activity and the Authority's decision to terminate Mullins to require resolution of her claim by a trier of fact. Cf. Ramos v. Molina Healthcare, Inc., No. 1:12-cv-856 (GBL/TCP), 2013 WL 4053227, at *16 (E.D. Va. Aug. 8, 2013) ("Plaintiff may not simply establish that the employer's legitimate permissible reasons were inaccurate without also demonstrating a nexus between the protected activity and the employer's decision to terminate. Plaintiff's declarations simply deny Defendants' assertions without tethering the termination to the protected meetings . . . .").

As the district court noted in Ferrell v. Harris Ventures, Inc., 812 F. Supp. 2d 741, 748 (E.D. Va. 2011):

> Questions of intent are hard to decide on summary judgment. They are almost always inferential, and best left to the trier of fact who can observe the witnesses and determine whether explanations hold water. "It is readily apparent that determining intent is fact-intensive, and when the circumstantial evidence of a person's intent is ambiguous, the question of intent cannot be resolved on summary judgment." Gen. Analytics Corp. v. CNA Ins. Cos., 86 F.3d 51, 54 (4th Cir.1996) (citation omitted). A great deal depends on when statements occurred and what their precise content was. This Court has observed that "the timing and content of several conversations is not just material, but potentially dispositive. There is sufficient conflict about interwoven events, and sufficient need for a fact finder to resolve credibility issues, to preclude summary judgment on the retaliation claim." Atkins v. Computer Scis. Corp., 264 F.Supp.2d 404, 413 (E.D.Va.2003).

Here, like in Ferrell, Mullins' complaints of discrimination, her statements concerning her lack of confidence in management, and her termination are interwoven. As such, summary judgment is not appropriate. See Thurston, 497 F. Supp. 2d at 781 ("[T]he plaintiff can survive summary judgment so long as [s]he has offered sufficient evidence to allow a reasonable jury to disbelieve the defendant's proffered reason for [terminating her]."). The trier of fact must resolve the ultimate question of whether Mullins has met her burden of proving that she was retaliated against in violation of Title VII.

## IV.

For these reasons, defendant's motion for summary judgment as to Mullins' retaliation claim is **DENIED**.

An appropriate Order will be entered.

                      Entered: November 6, 2013

                      */s/ Michael F. Urbanski*

                      Michael F. Urbanski
                      United States District Judge